## Case No. 683.

### AYER et al. v. The GLAUCUS.

[4 Cliff. 166.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1870.

APPEAL IN ADMIRALTY — TRIAL DE NOVO—COLLISION—BETWEEN STEAM AND SAIL— CREDIBILITY OF WITNESSES—LIGHTS.

1. There are cases in which it is suggested, if not decided, that an appellate court will not in general examine the decree of the subordinate court upon the merits, where the matter in issue depends upon the credibility of witnesses.

2. Since the passage of the act of March 3, 1803, [2 Stat. 244,] appeals are allowed to the circuit court from any decree rendered in the district court in any cause of admiralty and maritime jurisdiction, where the matter in dispute, exclusive of costs, exceeds the sum or value of fifty dollars.

3. The rules of the supreme court provide that the testimony given in the district court may be taken down by the clerk and transmitted to the circuit court, or, it may be retaken

---

[1] [Reported by William Henry Clifford, Esq., and here reprinted by permission.]

by deposition; and the fiftieth rule provides that further proof may be taken in the circuit court. This shows that the facts, as well as the law, are open to revision in the circuit court.

4. Where the appeal is on a question of fact, the burden is on the appellant to show that the decision of the inferior court was erroneous; but the court of paramount jurisdiction will examine the whole testimony in the case.

5. Both vessels in this case were bound to observe and follow the rules and regulations established by congress to prevent collisions, and if they had, the collision would not have occurred.

6. This was not a case of inevitable accident, because one or the other, or both, were in fault.

7. Steamships are required to keep out of the way of sailing vessels when the two are proceeding in such directions as to involve risk of collision, and the sailing vessel is required to keep her course subject to the qualification applicable to both, which is, that due regard must be had to all dangers of navigation, and also to any special circumstances, which may exist at the time, rendering departure from the requirement necessary in order to avoid immediate danger.

8. When witnesses on the different sides make irreconcilable statements, the question as to which shall be believed is to be determined by ascertaining who had the best means of knowledge and observation, as to the facts upon which the conflicting evidence is given.

9. The master, mate, wheelsman, and two seamen, were on the deck of a schooner at the time of her collision with a steamer. Three persons, the pilot, second mate, and wheelsman, were in the pilot-house of the steamer, and one seaman on her deck. These observed the schooner when a mile distant, and testified that she subsequently changed her course before the collision. The witnesses on the schooner testified that she did not. Held, in this case, the witnesses on board the schooner had the best means of knowledge as to what her management was.

10. Circumstantial evidence may be sufficient to control direct testimony, but in such case, the circumstantial facts from which the inference is to be drawn, should be fully proved.

11. An inference from an inference does not have much probative force.

12. A schooner in a clear night, with proper lights set, was heading north-west by west. A steamer was heading east by north. Witnesses in the pilot-house of the steamer said they saw both the red and green light of the schooner, and as the two vessels approached each other, the green light disappeared, from which it was argued that she must have ported her helm, and fallen off to the leeward. A seaman on the deck of the steamer, and standing on her starboard bow, saw only the red light of the schooner, and reported the same to the pilot. Held, it was a case where it was the duty of the steamer to keep out of the way of the schooner.

[On appeal from the district court of the United States for the district of Massachusetts.]

In admiralty. Libel [by James S. Ayer against the steamer Glaucus, the Metropolitan Steamship Company, claimants] in a cause of collision. Damages were claimed in this case by the libellants, as the owners of the schooner Electric Flash, on account of a collision which occurred between the schooner and the steam-propeller Glaucus, at ten

o'clock in the evening of Feb. 1, 1868, in Long Island sound, nearly opposite to New Haven, by which the schooner, with a full cargo on board, was run down and sunk, and became a total loss. Just before the collision took place, the schooner was close hauled on the port tack, beating up the sound, on a voyage from Newfoundland to the port of New York, and when she descried the steamer she was heading north-west by west, and, having a whole sail breeze from the west-south-west, she was making five and a half knots an hour. Her cargo consisted of frozen herring. The owners claimed damages for the loss of the cargo as well as for the loss of the schooner, and also for the loss of her provisions, nautical instruments, and charts. Bound down the sound, the Glaucus, a steam-propeller of eighteen hundred and forty-eight tons, new measurement, was on a voyage from New York to Boston, and she was heading east by north, and was making eleven knots. These facts were undisputed. It also appeared that the night was clear, and that the moon was shining and unobscured by clouds. [Decree for libellants. Claimants appeal. Affirmed.]

John C. Dodge, proctor for libellants.
F. C. Loring and M. F. Dickinson, Jr., proctors for claimants.

CLIFFORD, Circuit Justice. Causes of collision, civil and maritime, since the passage of the act establishing certain rules and regulations for preventing such disasters, depend, in most cases, upon controverted matters of fact, to be determined by the testimony of witnesses rather than upon questions of law. Decided cases may be referred to in which it is suggested, if not positively stated, that an appellate court will not, in general, re-examine the decree of the subordinate court upon the merits in such a case, where it appears that the matter in issue depends upon the credibility of the witnesses; but those remarks were not necessary to the decision of the appeal in any one of those cases, nor do they express the correct rule upon the subject as understood at the present time in the supreme court. Newell v. Norton, 3 Wall. [70 U. S.] 267; The Potomac, 2 Black, [67 U. S.] 584; The Marcellus, 1 Black, [66 U. S.] 417; The Water Witch, Id. 500. Since the passage of the act of March 3, 1803, appeals are allowed to the circuit court from any decree rendered in the district court, in any cause of admiralty and maritime jurisdiction, where the matter in dispute, exclusive of costs, exceeds the sum or value of fifty dollars, and the provision is, that the circuit court is authorized and required to "receive, hear, and determine such appeal." 2 Stat. 244. Provision is also made, by the rules prescribed by the supreme court, that the testimony given in the district court may be taken down by the clerk and be transmitted to the circuit court, to be there used on the appeal, or it may be retaken by deposition at the election of the parties, and the fiftieth rule provides that further proof may be taken in the circuit court, which shows to a demonstration that the facts as well as the law of the case are open to revision on appeal in the circuit court. The Baltimore, 8 Wall. [75 U. S.] 382. Where the appeal involves a question of fact, the burden is on the appellant to show that the decree rendered in the subordinate court is erroneous; but it is a mistake to suppose that the court of paramount jurisdiction will not re-examine the whole testimony in the case. 2 Stat. 244; [The Baltimore, supra;] 8 Wall. [75 U. S.] 382.

Both vessels, under the circumstances of this case, were bound to observe and follow the rules and regulations established by congress to prevent collisions on the water, and it is clear, if they had done so, the collision would not have occurred. 13 Stat. 60. Inevitable accident is not even suggested, nor could it be with any hope that any such view would be adopted by the court, as it was clear that one or the other, or both, were in fault. Union S. S. Co. v. New York & V. S. S. Co., 24 How. [65 U. S.] 313; The Morning Light, 2 Wall. [69 U. S.] 556. Proper regulation lights were shown by the schooner, as required by law, and the proofs also show to the entire satisfaction of the court that she had a competent lookout properly stationed on the vessel. Proper sidelights, as required by the regulations established by the act of April 29, 1864, were also shown by the steamer; but she had "a central range of two white lights," as required by section 11 of the act of July 25, 1866, for "all coasting steamers" and other steamers, navigating bays, lakes, rivers, &c., as therein specifically provided. 13 Stat. 59; 14 Stat. 228. Extended remarks upon the circumstance that the steamer had two white lights, instead of one only, as prescribed by the first-named provision, are unnecessary, as it is clear, even if the steamer was not one falling within the regulation established by the subsequent act, that the circumstance that she had two white lights did not contribute, in any respect whatever, to the disaster.

The respondents admit that the two vessels came in collision on the day, and substantially at the place, as assumed by the libellants, and that the schooner suffered damage; but they do not admit that she was totally lost, nor do they admit the extent of the injury to the cargo, as alleged in the libel. They admit the collision, without qualification, and the proofs show that the steamer struck the schooner on the port bow, near the stem, carrying away the bowsprit, stem, and port knight-head, and that the effect of the blow extended across the vessel, crushing out the starboard bow, which caused the vessel immediately to capsize and sink. Steamships are required to keep out of the way of a sailing ship, when the two are pro-

ceeding in such directions as to involve risk of collision, and the correlative duty required of the sailing ship is that where one of two ships is required to keep out of the way, the other shall keep her course, subject to the qualification applicable to both, that due regard must be had to all dangers of navigation, and also to any special circumstances which may exist at the time, rendering a departure from the requirement necessary, in order to avoid immediate danger. 13 Stat. 61; Mail Steamship Co. v. Rumball, 21 How. {62 U. S.] 384.

Argument to show that those rules are applicable to the case before the court is unnecessary, as that point is conceded by both parties, and is too plain for controversy. Prior to the collision, and at the time the two vessels came together, five persons, to wit, the master, mate, wheelsman, and two seamen, were on the deck of the schooner, three having been there for some time, and the other two came up from the lower watch just before the collision took place, and they all testify, in the most positive manner, that the schooner did not change her course. Support to their statements is also derived from the testimony of the master of the schooner "Nightingale," which was to the leeward, and sailing in the same direction as the schooner of the libellants. He was on deck at the time of the collision; saw both vessels at the time; and he states that he did not see any change in the course of the injured schooner before she was struck by the steamer. Testimony was introduced by the respondents, tending to show that the witness had made contradictory statements upon the subject out of court, but the testimony introduced for that purpose is not of a character to impair, essentially, the credit of the witness. Attempt is made by the respondents to controvert those statements, and to show by the statements of witnesses on board the steamer, and by evidence in its nature circumstantial, that the schooner did change her course, and that the collision was occasioned by that departure from the rules of navigation as established by the act of congress. Three persons were in the pilot-house of the steamer when the schooner was descried, and they remained there as the two vessels advanced to the place of collision; and there was also one seaman on the deck, called, in the testimony, the bow watch. Those in the pilot-house, to wit, the pilot, second mate, and wheelsman, testify that they descried the schooner when she was a mile distant, and they state that the schooner did subsequently change her course before the collision occurred. Repugnant statements cannot both be true, and when they cannot be reconciled, the one or the other must be rejected; and in the performance of that duty it usually becomes important to ascertain which witness had the best means of knowledge, as it is more reasonable to conclude that the error is the result of mistake than of deliberate intention. Evidently the libellants' witnesses speak from actual knowledge, and unless they have willfully stated what they know to be false, their statements, it would seem, must be correct. They were on the deck of the schooner, and they cannot well be mistaken in respect to the matter in controversy. Distant nearly a mile,—as the respondents' witnesses were,—and situated in the pilot-house of the steamer, they could only infer what they have affirmed, or to say the least, inference must have entered very largely into their statements as to what transpired on the deck of the schooner, as it is hardly to be credited that they could see either the helmsman, or the wheel. Mail Steamship Co. v. Rumball, 21 How. [62 U. S.] 382.

Certain circumstances, stated by the witnesses situated in the pilot-house of the steamer, are invoked by the respondents as confirmatory of their theory, and it is insisted, in argument, that one of those circumstances is of itself sufficient to overcome the statement of the libellants' witnesses, that the schooner did not change her course; and to prove the affirmative of that issue, circumstantial evidence may undoubtedly be sufficient to control direct testimony of a repugnant tendency, and to establish a theory of an opposite character; but it is indispensably necessary, in order that it may have any such effect, that the circumstantial facts, from which the inference is to be drawn, should be fully proved. An inference from an inference, if it be allowable at all, cannot be regarded, even in a civil case, as having much probative force, because the chances that it may be erroneous render it unsafe as the basis of judicial action. This is especially so when it is opposed to the direct statements of credible witnesses, who are otherwise entirely unimpeached. Presumptive proof is admissible in every case; but the collateral facts, from which the presumption is drawn, must be fully proved. Certainly no safe inference or presumption can be drawn from such facts until they are satisfactorily established. 1 Stark. Ev. 13, 57. The express testimony of the witnesses in the pilot-house of the steamer is, that when they first descried the schooner, they saw both her green and red lights, and that, as she advanced, her green light disappeared, and the inference from that circumstance is that she ported her helm, and fell off to the leeward. Sailing ships under way shall carry the same lights as steamships under way, "with the exception of the white mast-head light, which they shall never carry," that is, they shall carry a green light on the starboard side, and a red light on the port side, constructed as required in the regulations enacted by congress; and the further provision is, that they shall both be fitted with inboard screens, projecting at least three feet forward from the light, so as to prevent those lights from being seen across the bow. Lights constructed and fitted in that way

may both be seen at the same time at that distance in a clear night, when the two vessels are approaching head on, or nearly head on; but the steamer was heading east by north, and the schooner was heading northwest by west; and the statements of those witnesses are, that they saw the green light of the schooner, as well as her red light, four points over the starboard bow of the steamer. Undoubtedly they might have seen the red light under those circumstances; but it was conceded in argument that they could hardly have seen the green light at the same time, unless there is some error in the basis of facts as assumed by both sides. Confirmation of the view that those witnesses are in error is found in the testimony of the seaman, called the bow watch, who was stationed as a lookout on the starboard bow of the steamer. Standing there, his position and opportunity for seeing both lights, if they could be seen at all on that angle, were much better than the other witnesses, as he was farther forward, and was standing nearer the water-line of the vessel. He saw the red light only, and he testifies that he reported the light as soon as he saw it, which shows that the attention of the pilot was called to the red light as soon as it was seen by the lookout. Several other circumstances are referred to by the respondents in supporting their theory that the schooner changed her course; but they are of such slight probative force that it does not appear to be necessary to give them a separate examination. Viewed in any proper light, the case is one where it was the duty of the steamer to keep out of the way of the schooner, and the proofs show to a demonstration that she did not perform that duty; and as there were no obstacles to prevent her from avoiding the schooner, she must answer for the consequences. When she starboarded her helm "a little," if she had put it hard a-starboard, she would have gone clear, or if she had ported her helm, she would have gone under the stern of the schooner. Both parties excepted to the commissioner's report; but the court is of the opinion that none of the exceptions ought to be sustained. Decree affirmed, with costs.